**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ABAXES LLC, a Delaware limited liability company, individually and on behalf of a class of others similarly situated, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| VL TRUCKING, INC., an Illinois corporation; ALEX NEDELTCHEV, an individual; VOLODYMYR LYNEVYCH, an individual; and VITALI MURATOV, an individual, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**CLASS ACTION COMPLAINT**

Plaintiff Abaxes LLC ("Abaxes"), individually and on behalf of those similarly situated, by and through its counsel, bring this Class Action Complaint against defendants VL Trucking, Inc. ("VL"), Alex Nedeltchev ("Nedeltchev"), Volodymyr Lynevych ("Lynevych"), and Vitali Muratov ("Muratov," collectively "Defendants") and allege as follows:

**PRELIMINARY STATEMENT**

1.      Abaxes is an owner-operator that transports cargo via over the road tractor trailers. Abaxes performs trucking services for federally licensed motor carriers like VL.

2.      Abaxes brings this action against Defendants for violations of federal Truth in Leasing regulations and fraud, among other things.

3.      VL has violated its lease obligations under federal Truth in Leasing regulations. Among other things, VL has failed to include federally mandated lease provisions that would

1

protect the rights of its drivers and allow those drivers to receive the full compensation owed to them.

4.　　VL—either by Nedeltchev, Lynevych, and/or Muratov or with their knowledge—also employed a brazen and widespread scheme to defraud Abaxes. The scheme was a regular business practice that involved directly lying to Abaxes about its true compensation and secretly forging counterfeit Rate Confirmations issued by VL's customers before sending those Rate Confirmations on to Abaxes.

5.　　Upon information and belief, VL—either by Nedeltchev, Lynevych, and/or Muratov or with their knowledge—also has engaged in this same fraudulent practice with other owner-operators.

6.　　As a result, Abaxes brings this action individually and on behalf of those similarly situated.

## PARTIES

7.　　Abaxes is a Delaware limited liability company with its principal place of business located at 8 The Green Road, Suite A, Dover, Delaware. Abaxes is a trucking company (*i.e.*, an owner-operator) that provides freight transportation services and trucking equipment to motor carriers like VL. It entered into lease agreements with VL where VL would lease Abaxes's trucking equipment and Abaxes would use that equipment to transport loads across the United States at VL's direction. A true and correct copy of the lease agreements (the "Independent Contractor Lease Agreements") are attached as **Exhibits A** and **B**.

8.　　VL is an Illinois corporation with its principal place of business located at 200 Howard Avenue, Suite 250, Des Plaines, Illinois. In addition to its corporate headquarters, VL operates carrier services out of Cedar Rapids, Iowa.

9.      Nedeltchev is the Chief Executive Officer of VL, and he resides in the village of Northbrook, Cook County, Illinois. As CEO, he directed and participated in the wrongful conduct of VL, and his knowledge is attributable to VL.

10.     Lynevych is the President and Owner of VL, and he resides in the village of Norridge, Cook County, Illinois. In his roles with VL, he also directed and participated in the wrongful conduct of the other Defendants, and his knowledge is attributable to VL.

11.     Muratov is the Operations Manager for VL, and he resides in the village of Buffalo Grove, Cook County, Illinois. In his role as Operations Manager, he directed and participated in the wrongful conduct of VL, and his knowledge is attributable to VL.

## JURISDICTION AND VENUE

12.     This Court has original jurisdiction over all claims in this action pursuant to 28 U.S.C § 1331 and § 1337(a) because the claims asserted in the Complaint arise under the Motor Carrier Act, 49 U.S.C. §§ 14101 and 14701 *et seq.*, and the Truth in Leasing regulations promulgated pursuant to that act, namely 49 C.F.R. § 376.12.

13.     This Court also has original jurisdiction over all claims in this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  This is a putative class action in which (1) there are 100 or more members in the proposed class; (2) more than one-third of the proposed class members have a different citizenship from Defendants as detailed below, and (3) Abaxes and the proposed class members' claims exceed $5,000,000.00 in the aggregate.

14.     In addition, this Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Abaxes's state claims because they derive from a common nucleus of operative fact and are part of the same case or controversy.

15. This Court also has personal jurisdiction over the Defendants as each defendant is a resident of the State of Illinois. Furthermore, the lease agreements at issue in this case establish that Defendants have agreed to be subject to personal jurisdiction in this Court. *See* **Exs. A** and **B**, at 10.

16. Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because VL's headquarters is located in this judicial district and Nedeltchev, Lynevych, and Muratov reside in this judicial district. Furthermore, one or more of the Defendants transact business in this district; maintain offices, terminals, and dispatch offices in this district; have agents in this district; or are found within this district. Upon information and belief, Defendants have and continue to carry out their wrongful acts in this district. Also, the lease agreements at issue in this case establish that Defendants have agreed to venue in this Court. *See* **Exs. A** and **B**, at 10.

## FEDERAL REGULATORY SETTING

17. Under federal law, an authorized motor carrier may perform authorized transportation in equipment it does not own only under a written lease granting use of the equipment and satisfying the requirements set forth in 49 U.S.C. § 14102 and 49 C.F.R. § 376.12. A person who is injured because of a carrier's violations of the regulations may bring an action to obtain injunctive relief and damages and attorneys' fees and costs. See 49 U.S.C. § 14704(a)(1)-(2), (c).

## FACTS

18. The trucking industry is comprised of several components that work together to transport goods nationwide. Generally, a person seeking to ship goods (*e.g.*, customer, seller, manufacturer, etc.) retains a broker to locate and hire a motor carrier to ship the goods. Once the broker locates a motor carrier, the motor carrier may dispatch an owner-operator to haul the goods

to their destination pursuant to a separate agreement between the carrier and the owner-operator. If there are no issues with the delivery, the broker pays the motor carrier, and based on that price, the motor carrier pays an agreed-upon share to the owner-operator for hauling the load.

19.     When a broker enters an agreement with a motor carrier to transport goods, the broker sends the motor carrier a document known in the industry as a "Rate Confirmation." Each Rate Confirmation contains details about the load being hauled, including, but not limited to, the carrier, the pick-up and drop-off locations and times, a unique order identifier, any special instructions for the owner-operator, and the compensation due from the broker to the motor carrier for hauling and delivering the load.

20.     Once the motor carrier and broker enter into the agreement to transport goods, the carrier subsequently assigns the job to an owner-operator with whom the carrier has a separate lease agreement. The motor carrier also sends the owner-operator a copy of the broker's Rate Confirmation sheet because it confirms the job and sets the baseline for how the owner-operator will be paid for transporting the load.

21.     There are also situations where a customer may choose to deal directly with the motor carrier instead of working through a broker. In those cases, the customer will enter into an agreement with the motor carrier to transport the customer's goods, and the customer will send a Rate Confirmation directly to the motor carrier. From that point, the motor carrier assigns the job to an owner-operator with whom the carrier has a separate lease agreement. The motor carrier also forwards a copy of the customer's Rate Confirmation sheet to the owner-operator to confirm the job and set the baseline for what the owner-operator will be paid for hauling the load.

22.     Separately, motor carriers will enter into various agreements with owner-operators, including ones like the agreements at issue here where an owner-operator will lease their trucking

equipment to a carrier, and the owner-operator will use that equipment to transport a shipment on the carrier's behalf. Pursuant to federal regulations, such a lease agreement must outline, among other things, how an owner-operator is compensated for use of their equipment and transportation services (less any expenses) and how chargebacks for those various expenses are computed. The federal regulations require the contract to give the owner-operator the right to examine all documents from which rates or charges are computed and require the motor carrier to provide those documents to the owner-operator upon request.

23.    On or about September 2, 2020, Abaxes entered into a lease agreement with VL. **Ex. A**. The agreement provides that VL would lease certain trucking equipment from Abaxes for the purposes of transporting goods and that Abaxes would in turn use this equipment to transport those loads for VL. *Id.* The lease further states that the term would be for one year and would renew on an annual basis so long as any equipment remained leased to VL. *Id.*

24.    On or about September 23, 2020, Abaxes entered into another lease agreement with VL under almost identical terms as the September 2 lease. **Ex. B**. Abaxes signed this new lease because the tractor that it originally leased to VL broke down and could not be repaired. The September 23 lease provided that Abaxes would lease different trucking equipment from VL (through an entity called New Age Leasing, LLC) with the option of purchasing that equipment. *Id.* at App'x D; **Ex. C** ("Tractor Lease Agreement With Option to Purchase" with New Age Leasing, LLC). Abaxes paid New Age Leasing $499 each week for this equipment, a fee that was deducted from the amount Abaxes received from VL for transporting goods on VL's behalf. *Id.* For all intents and purposes, Abaxes was considered the "owner-operator" of the leased trucking equipment under the September 23 lease with VL.

25.     VL exclusively drafted the lease agreements at issue. VL informed Abaxes that it was required to sign the agreements and the agreements were not subject to any negotiation.

26.     Pursuant to each agreement, VL had the right to exclusively use Abaxes's trucking equipment for the leased period. In other words, Abaxes could not use the leased equipment to transport goods for any other motor carrier during the lease period. **Exs. A** and **B**, at 2-3.

27.     During lease period, VL would dispatch a job to Abaxes, and Abaxes would use the leased equipment for that job. Generally, when a job was dispatched, Abaxes had to accept it without any real negotiation as to terms or compensation. VL would call Abaxes to verbally confirm the job, and if Abaxes accepted it, VL would typically send Abaxes a Rate Confirmation.

28.     However, there were times throughout the lease periods where VL failed to send these Rate Confirmations. Then, as of August 2021, a VL dispatcher informed Abaxes that VL would no longer send Rate Confirmations. The dispatcher told Abaxes that this was because VL had "some legal issues" with an ongoing fraud case that had been reported to the Des Plaines Police Department. From August 2021 on, however, VL refused to provide Rate Confirmations to Abaxes, even if requested.

29.     Once Abaxes completed a job, it was to be compensated pursuant to the lease agreements. Appendix B to each agreement provides that Abaxes would be compensated for use of its leased equipment and services on a shipment-by-shipment basis. **Exs. A** and **B**, at 12. Specifically, Abaxes was to be paid 80% of the "Gross Revenue" VL received from a customer or a broker for a given shipment. *Id.* Appendix B defines "Gross Revenue" as the "total compensation <u>actually received</u>" by VL for transporting a shipment. *Id.* (emphasis in original).

30.     In situations where VL provided Rate Confirmation sheets to Abaxes, VL would obtain a Rate Confirmation sheet directly from a customer (if there was no broker arranging the

haul) or a broker. As the customer or broker generate the Rate Confirmation for VL, the customer or broker's logo would appear somewhere on the sheet. That document also shows the gross amount the customer or broker would pay to VL for the job. However, instead of sending that Rate Confirmation directly to Abaxes, VL dispatchers—at Nedeltchev, Lynevych, and/or Muratov's direction or with their knowledge—would secretly alter the total amount the customer or broker originally inputted. As a result, VL forged a new counterfeit Rate Confirmation sheet showing a lower total price for the overall job, and it would send that altered sheet to Abaxes. Once Abaxes completed the job, VL would pay Abaxes 80% of the lowered total amount on the doctored Rate Confirmation instead of 80% of the actual price that the customer or broker originally inputted.

31.     In cases where VL did not provide Rate Confirmations to Abaxes, a VL dispatcher—at Nedeltchev, Lynevych, and/or Muratov's direction or with their knowledge— would instead text an Abaxes driver to inform the driver about a new job. The dispatcher would provide the driver with details about the shipment (*i.e.*, where to pick up and drop off the load). The dispatcher would then tell Abaxes what the rate for the job was. However, in these cases, the dispatcher lied about what the gross rate was—the customer or broker actually paid VL a higher amount for these loads than what the VL dispatcher told Abaxes. So, once Abaxes completed a job, VL would pay Abaxes 80% of the fraudulent rate the VL dispatcher stated in the text instead of 80% of the higher rate the customer or broker actually paid VL.

32.     Abaxes learned of Defendants' fraudulent conduct in May 2021. That month, a VL dispatcher texted an Abaxes driver with details about a line haul from Wisconsin to Delaware. The dispatcher told the driver that the rate for the haul was $3,000. **Ex. D** (text message exchanges between Riley Copple, owner of Abaxes, and VL dispatcher), at 1. However, when the driver picked up the load in Wisconsin, the customer provided the driver with a bill of lading showing

that the customer actually paid VL $4,200 for the job. **Ex. E** ("Straight Bill of Lading" dated May 18, 2021), at 3. When the driver confronted the VL dispatcher about this discrepancy, the dispatcher responded, "Damn, that's probably what the customer is getting paid. Or who ever [*sic*] ordered the product[,] that[']s how brokers/shippers make their money when they broker out freight[.]" **Ex. D**, at 2.

33.     On May 28, 2021, VL paid Abaxes for the line haul from Wisconsin to Delaware. **Ex. F** ("Statement #19754" dated May 28, 2021). Instead of paying Abaxes 80% of the $4,200 figure outlined in the bill of lading from the customer, VL paid Abaxes 80% of the fraudulently lowered figure that the dispatcher provided the Abaxes driver in the text message confirming the job—what amounted to a $1,200 difference. *Cf.* **Exs. E** and **F** *with* **Ex. D**, at 1. None of the Defendants ever disclosed that VL actually received $4,200 from this customer.

34.     Later in May 2021, the VL dispatcher texted an Abaxes driver with details about a line haul from Wisconsin to Arkansas. The dispatcher told the driver that the rate for the haul was $2,700. **Ex. D**, at 3. However, when the driver picked up the load in Wisconsin, the customer provided the driver with a bill of lading showing that the customer actually paid VL $3,700 for the job. **Ex. G** ("Straight Bill of Lading" dated May 26, 2021), at 6.

35.     On June 11, 2021, VL paid Abaxes for the line haul from Wisconsin to Arkansas. **Ex. H** ("Statement #20132" dated June 11, 2021). Instead of paying Abaxes 80% of the $3,700 figure outlined in the bill of lading from the customer, VL paid Abaxes 80% of the fraudulently lowered figure that the dispatcher provided the Abaxes driver in the text message confirming the job—what amounted to a $1,000 difference. *Cf.* **Exs. G** and **H** *with* **Ex. D**, at 3. None of the Defendants ever disclosed that VL actually received $3,700 from this customer.

36.     Upon learning of VL's fraud, Abaxes chose not to renew its lease agreement with VL after the lease expired in September 2021.

37.     In March 2022, Abaxes continued to investigate other transportation jobs it performed for VL. This is when Abaxes learned that VL—at Nedeltchev, Lynevych, and/or Muratov's direction or with their knowledge—also had an established practice of fraudulently altering brokers' Rate Confirmation sheets before sending those along to Abaxes. Abaxes was able to confirm that at least three different brokers paid VL a higher amount for a job than the amount reflected on the counterfeit Rate Confirmation VL created for that job and sent to Abaxes.

38.     In the first instance, Abaxes received a Rate Confirmation from VL that purportedly came from a broker named Armstrong Transport Group ("Armstrong"). It contained Armstrong's identifying information and outlined the shipment details for a line haul from Minnesota to Florida in November 2020. **Ex. I** (Forged Armstrong Rate Confirmation). This Rate Confirmation revealed that Armstrong paid VL a total of $4,500 to transport the load. *Id.* Abaxes was accordingly paid 80% of the $4,500 amount reflected on the Rate Confirmation VL sent.

39.     However, in March 2022, Abaxes learned that VL—at Nedeltchev, Lynevych, and/or Muratov's direction or with their knowledge—fraudulently altered the Armstrong Rate Confirmation before sending it to Abaxes. Abaxes contacted Armstrong to confirm the price Armstrong paid VL for the November 2020 job. An Armstrong representative informed Abaxes that it actually paid VL $5,300 for that line haul. VL skimmed the $800 difference off the top in addition to receiving 20% of the fraudulently lowered amount. None of the Defendants ever disclosed that VL actually received $5,300 from Armstrong.

40.     In the second instance, Abaxes received a Rate Confirmation from VL that purportedly came from a broker named Coyote Logistics ("Coyote"). It bore Coyote's logo and

outlined the shipment details for a line haul from Ohio to Pennsylvania in December 2020. **Ex. J** (Forged Coyote Rate Confirmation). This Rate Confirmation revealed that Coyote paid VL a total of $2,500 to transport the load. *Id.* Abaxes was accordingly paid 80% of the $2,500 amount reflected on the Rate Confirmation VL sent.

41.     However, in March 2022, Abaxes learned that VL—at Nedeltchev, Lynevych, and/or Muratov's direction or with their knowledge—fraudulently altered the Coyote Rate Confirmation before sending it to Abaxes. Abaxes contacted Coyote to confirm the price Coyote paid VL for the December 2020 job. A Coyote representative informed Abaxes that it actually paid VL $2,800 for that line haul. VL skimmed the $300 difference off the top in addition to receiving 20% of the fraudulently lowered amount. None of the Defendants ever disclosed that VL actually received $2,800 from Coyote.

42.     In the third instance, Abaxes received a Rate Confirmation from VL that purportedly came from a broker named J. Gust Transportation, Inc. ("J. Gust"). It bore J. Gust's logo and outlined the shipment details for a line haul from California to Iowa in late December 2020. **Ex. K** (Forged J. Gust Rate Confirmation). This Rate Confirmation revealed that Coyote paid VL a total of $4,500 to transport the load. *Id.* Abaxes was accordingly paid 80% of the $4,500 amount reflected on the Rate Confirmation VL sent.

43.     However, in March 2022, Abaxes learned that VL—at Nedeltchev, Lynevych, and/or Muratov's direction or with their knowledge—fraudulently altered the J. Gust Rate Confirmation before sending it to Abaxes. Abaxes contacted J. Gust to confirm the price J. Gust paid VL for the December 2020 job. A J. Gust representative informed Abaxes that it actually paid VL $4,900 for that line haul. VL skimmed the $400 difference off the top in addition to receiving

11

20% of the fraudulently lowered amount. None of the Defendants ever disclosed that VL actually received $4,900 from J. Gust.

44.     VL has also told certain owner-operators that VL keeps the extra money as a reserve for future chargebacks that might be incurred by any of owner-operators working for VL. There is nothing in the lease agreements informing owner-operators of this practice. *See*, *e.g.*, **Exs. A** and **B**. Creation of this undisclosed slush fund for contingencies that may or may not occur to other owner-operators is therefore illegal under the Truth In Leasing Act.

45.     As of the date this Complaint was filed, no Defendant has compensated Abaxes for the differences between: (1) the false rate information the VL dispatcher provided to Abaxes and the actual rate information Abaxes received from customers or brokers, and (2) the fraudulent Rate Confirmations Defendants provided to Abaxes and the actual Rate Confirmations the brokers provided to VL. Despite Abaxes's request, no Defendant has provided Abaxes with any pricing documentation corroborating the amount Abaxes received as required by 49 C.F.R. § 376.12. Furthermore, despite requests from owner-operators, no Defendant has provided them with any pricing documentation corroborating any chargeback amounts as required by 49 C.F.R. § 376.12.

46.     Upon information and belief, Defendants consistently and knowingly lied to owner-operators (including Abaxes and other members of the Class) about rate information, and they consistently and knowingly altered, or caused to be altered, customers' and brokers' Rate Confirmations to systematically defraud owner-operators (including Abaxes and other members of the Class) and retain a larger portion of the revenue they received from those customers and brokers. This fraudulent scheme is designed to financially benefit the Defendants to the detriment of those owner-operators.

47.     Upon information and belief and based on Abaxes's above investigation, Defendants were either aware of and authorized the artificially lowered compensation amounts, were reckless in not discovering the artificially lowered compensation amounts, or fraudulently lowered the compensation amounts to owner-operators, including Abaxes and other members of the Class.

48.     Damages to Abaxes alone are believed to exceed $500,000.

## CLASS ACTION ALLEGATIONS

49.     Abaxes brings this action on its own behalf and as a class action pursuant to Rule 23(a) and (b) of the Federal Rules of Civil Procedure.  The Class is defined as:

> All equipment owner-operators in the United States who, during the period April 22, 2019, to the present (the "Class Period"), had or have lease agreements with VL or its affiliates, parents, and subsidiaries; who have hauled shipments pursuant to those agreements; and whose lease agreements are subject to federal regulations contained in Part 376, Code of Federal Regulations.

50.     The persons in the Class defined above are so numerous that joinder of all members in impracticable.  Although the precise number of such persons is unknown, upon information and belief, VL has entered into more than 100 lease agreements with owner-operators who satisfy the definition of the Class.

51.     There are questions of law and fact common to this Class that predominate over any questions solely affecting individual members of the Class, including but not limited to:

    a.     Whether Defendants have violated the ICC Termination Act of 1995;

    b.     Whether Defendants have violated the Motor Carrier Act;

    c.     Whether the lease agreements violate the Truth-in-Leasing regulations;

    d.     Whether Defendants have breached their lease agreements with Abaxes and members of the Class;

e.      Whether Defendants engage in a common course of fraudulent conduct to systematically reduce compensation owed and paid to Abaxes and members of the Class under the lease agreements;

f.      Whether Defendants improperly reduced and miscalculated the true compensation to Abaxes and the members of the Class;

g.      Whether Defendants' conduct and actions caused injury to Abaxes and the members of the Class;

h.      The proper measure of damages sustained by Abaxes and the Class; and

i.      Whether Defendants should be enjoined from such violations in the future.

52.     Abaxes's claims are typical of those of the Class. Abaxes, like the other members of the Class, was subjected to VL's common and uniform practice of defrauding Abaxes and failing to properly compensate Abaxes under the lease agreements and in violation of the law.

53.     Abaxes will fairly and adequately protect the interests of the Class and have retained counsel experienced in complex class action litigation.

54.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy, particularly in the context of this litigation where individual plaintiffs lack the financial resources to vigorously prosecute separate lawsuits in federal court against Defendants who are engaged in a widespread scheme to defraud each member of the Class.

55.     Class certification of the claims is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(1) because the prosecution of separate actions by individual members of the Class would create a risk of duplicative litigation that might result in inconsistent or varying adjudications.

56.     Class certification of the claims is also appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate declaratory and injunctive relief.  The Class is also entitled

to injunctive relief to end Defendants' brazen and widespread scheme of defrauding Abaxes and other owner-operators.

57.     Class certification is also appropriate under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of the litigation.  Defendants' common and uniform practices defrauded the Class when Defendants lied to Class members in text exchanges about the actual rate VL received for a job, forged brokers' Rate Confirmations, represented those altered Rate Confirmations as the true revenue VL received from the brokers, and paid the Class a lower amount than the Class was entitled to receive under the lease agreements.  The damages suffered by the individual Class members are small compared to the expense and burden of individual prosecution of this litigation. However, Abaxes and the proposed Class members' claims exceed $5,000,000.00 in the aggregate.

58.     Abaxes intends to send notice to all members of the Class to the extent required by Rule 23.

## COUNT I

**Violation of the ICC Termination Act of 1995 – 49 U.S.C. § 13708(b) (as to Defendant VL)
(Brought by Abaxes on Behalf of Itself and the Class)**

59.     Abaxes reasserts and incorporates by reference the allegations in the preceding paragraphs.

60.     VL is a "motor carrier" as the term is defined in 49 U.S.C. § 13102(14) and is subject to the jurisdiction of the Secretary of Transportation and the Surface Transportation Board under 49 U.S.C. § 13501.

61.     49 U.S.C. § 13708(b) states that "No person may cause a motor carrier to present false or misleading information on a document about the actual rate, charge, or allowance to any party to the transaction."

62.     As Abaxes and members of the Class haul loads on VL's behalf and receive a majority of the load's rate as compensation, Abaxes and members of the Class are a "party" to the above-referenced shipping transactions between VL and its brokers.

63.     During the Class Period, VL, at Nedeltchev, Lynevych, and/or Muratov's direction or with their knowledge, consistently presented to Abaxes and members of the Class false or misleading information about the rates that customers and brokers actually paid VL.

64.     In the alternative to the preceding paragraph, during the Class Period, while one or more of VL's agents altered the Rate Confirmations VL presented to Abaxes and members of the Class, VL could not have presented those confirmations without either Nedeltchev, Lynevych, and/or Muratov's approval and/or authorization of the alterations. Even if Nedeltchev, Lynevych, and/or Muratov did not personally alter the Rate Confirmations, their approval and/or authorization of the alterations was the legal cause of the injuries to Abaxes and members of the Class. This is because Nedeltchev, Lynevych, and/or Muratov constructed and approved of a fraudulent scheme with an intent to injure Abaxes and members of the Class by failing to pay them as the lease agreements required.

65.     49 U.S.C. § 14911 states:

"An act or omission that would be a violation of this part if committed by a director, officer, receiver, trustee, lessee, agent, or employee of a carrier providing transportation or service subject to jurisdiction under chapter 135 that is a corporation is also a violation of this part by that corporation. The penalties of this chapter [49 U.S.C. §14901 *et seq.*] apply to that violation. When acting in the scope of their employment, the actions and omissions of individuals acting for or employed by that carrier are considered to be the actions and omissions of that carrier as well as that individual."

16

Accordingly, VL is liable for Nedeltchev, Lynevych, and/or Muratov's acts and omissions as stated above, as well as the acts and omissions of any other of its directors, officers, agents, or employees. By virtue of these facts, VL violated 49 U.S.C. § 13708(b).

66.     As a result of that violation, Abaxes and members of the Class are entitled to recover their actual damages, which for Abaxes will consist of 80% of the difference between the compensation amount that a customer or broker paid to VL and the compensation amount that Defendants fraudulently misrepresented to Abaxes for each load that Abaxes hauled for VL during the Class Period. Damages for the members of the Class will be calculated similarly based on the agreed-upon compensation rates in their respective lease agreements with VL.

67.     Abaxes and members of the Class are also entitled to attorneys' fees and costs pursuant to 49 U.S.C. § 14704(e).

## COUNT II

**Violation of Truth-in-Leasing regulations – 49 C.F.R. § 376.12 (as to Defendant VL)**
**(Brought by Abaxes on Behalf of Itself and the Class)**

68.     Abaxes reasserts and incorporates by reference the allegations in paragraphs 1-58.

69.     Under 49 C.F.R. § 376.12(d), the "amount to be paid by the authorized carrier for equipment and driver's services shall be *clearly stated* on the face of the lease or in an addendum which is attached to the lease." (Emphasis added.)

70.     During the Class Period, VL, at Nedeltchev, Lynevych, and/or Muratov's direction or with their knowledge, violated § 376.12(d) by failing to disclose in the lease agreements that it would be compensating Abaxes and members of the Class based on an amount that was less than the actual gross amount VL received for the shipment—even though they were promised to be paid a set percentage of that gross amount.

17

71. During the Class Period, VL, at Nedeltchev, Lynevych, and/or Muratov's direction or with their knowledge, violated § 376.12(d) by using lease agreements that failed to identify or disclose that the amounts used to calculate the compensation for Abaxes and member of the Class would be less than the actual amount charged to the broker.

72. 49 C.F.R. § 376.12(g) provides:

"When a lessor's revenue is based on a percentage of the gross revenue for a shipment, the lease must specify that the authorized carrier will give the lessor, before or at the time of settlement, a copy of the rated freight bill, or, in the case of contract carriers, any other form of documentation actually used for a shipment containing the same information that would appear on a rated freight bill. Regardless of the method of compensation, the lease must permit lessor to examine copies of the carrier's tariff or, in the case of contract carriers, other documents from which rates and charges are computed, provided that where rates and charges are computed from a contract of a contract carrier, only those portions of the contract containing the same information that would appear on a rated freight bill need be disclosed."

73. During the Class Period, VL, at Nedeltchev, Lynevych, and/or Muratov's direction or with their knowledge, violated § 376.12(g) when it refused to provide pricing documentation (*i.e.*, valid Rate Confirmations) supporting calculation of compensation to Abaxes and members of the Class upon their request.

74. Pursuant to 49 C.F.R. § 376.12(h):

"The lease shall *clearly specify* all items that may be initially paid for by the authorized carrier, but ultimately deducted from the lessor's compensation at the time of payment or settlement, together with a recitation as to how the amount of each item is to be computed. The lessor shall be afforded copies of those documents which are necessary to determine the validity of the charge." (Emphasis added.)

75. During the Class Period, VL, at Nedeltchev, Lynevych, and/or Muratov's direction or with their knowledge, violated § 376.12(h) when it refused to provide documentation supporting alleged chargebacks to Abaxes and members of the Class upon their request.

76. 49 C.F.R. § 376.12(h) does not allow a motor carrier to create pools for future chargeback items that may or may not occur.

18

77. 49 C.F.R. § 376.12(h) does not allow a motor carrier to create a pool that it can hold at its sole discretion for unidentified chargebacks.

78. 49 C.F.R. § 376.12(h) does not allow a motor carrier to create a pool that takes money from one owner-operator to cover chargebacks incurred by any and all owner-operators working for that motor carrier.

79. 49 C.F.R. § 376.12(h) does not allow a motor carrier to create a secret, undisclosed pool of funds by creating counterfeit Rate Confirmations that falsely represent the amounts brokers paid for the job and pocketing the difference.

80. During the Class Period, VL, at Nedeltchev, Lynevych, and/or Muratov's direction or with their knowledge, violated § 376.12(h) in that it failed to explicitly identify its secret chargeback slush fund in the lease agreements with Abaxes and members of the Class. There is no language in either agreement indicating that VL has created a fund to pay for possible future chargebacks (which may or may not occur) for all owner-operators working for VL.

81. There is also no language in the lease agreements explaining how or when the amounts would be refunded if Abaxes and the members of the Class did not incur any chargebacks. And there is certainly no language in the lease agreements allowing VL to create this secret slush fund by lying about the true rates for a shipment, forging brokers' Rate Confirmations, falsely representing the amount VL was paid, and pocketing the difference.

82. As a direct and proximate result of these violations, owner-operators, including Abaxes and members of the Class, were injured. Actual damages for Abaxes will consist of 80% of the difference between the compensation amount that a broker paid to VL and the compensation amount that Defendants fraudulently misrepresented to Abaxes for each load that Abaxes hauled

for VL during the Class Period. Damages for the members of the Class will be calculated similarly based on the agreed-upon compensation rates in their respective lease agreements with VL.

83.     Plaintiffs also seek an injunction to prevent VL from continuing its unlawful practices.

## COUNT III

### Violation of the Illinois Consumer Fraud and
### Deceptive Business Practices Act – 815 ILCS 505/2 (all Defendants)
### (Brought by Abaxes on Behalf of Itself and the Class)

84.     Abaxes reasserts and incorporates by reference the allegations in paragraphs 1-58.

85.     815 ILCS 505/2(e) defines a "consumer" as any "person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use."

86.     The definition of "person" in 815 ILCS 505/2(c) includes any natural person or any foreign or domestic corporation and its agents, employees, or officers.

87.     The definition of "merchandise" in 815 ILCS 505/2(b) includes any "services."

88.     Abaxes and members of the Class are consumers as defined in 815 ILCS 505/1(e). Pursuant to the lease agreements, Abaxes and members of the Class purchased "merchandise"— *i.e.*, dispatching services and various other services such as preparing International Fuel Tax Agreements ("IFTA") and renting trailers—from VL.

89.     815 ILCS 505/2 provides in relevant part:

"Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby."

90.     During the Class Period, Defendants engaged in deceptive acts or practices by falsely representing in lease agreements with Abaxes and members of the Class that VL would pay them an agreed-upon percentage, less valid expenses, of the gross amount VL received from customers and brokers. Pursuant to the lease agreements, VL would also retain a smaller percentage for its administrative expenses, including the various services it sold Abaxes and members of the Class.

91.     In reality, VL never paid Abaxes and members of the Class based on the agreed-upon percentage of the gross amount VL actually received. Instead, VL falsely represented to Abaxes and members of the Class (via text messages and other written electronic communications or via a forged Rate Confirmation) the total amount a broker paid to VL for a given job. VL then paid Abaxes and members of the Class based on a percentage of the fraudulently altered amount reflected in those texts/electronic communications and/or counterfeit Rate Confirmations.

92.     Without notifying Abaxes and members of the Class, Defendants engaged in an ongoing scheme to defraud Abaxes and members of the Class. During the Class Period, VL dispatchers—at Nedeltchev, Lynevych, and/or Muratov's direction or with their knowledge— consistently and intentionally sent text messages or other written electronic communications to Abaxes and members of the Class that falsely misrepresented amounts that customers or brokers actually paid to VL for a given shipment. VL then paid Abaxes and members of the Class the agreed-upon percentage of that fraudulently lowered amount. This allowed VL to skim the difference off the top while still receiving its percentage under the lease agreements.

93.     Without notifying Abaxes and members of the Class, Defendants engaged in an ongoing scheme to defraud Abaxes and members of the Class. During the Class Period, VL dispatchers—at Nedeltchev, Lynevych, and/or Muratov's direction or with their knowledge—

consistently and intentionally forged the brokers' Rate Confirmations to falsely represent the amount the customers or brokers paid VL for a given job. VL dispatchers—at Nedeltchev, Lynevych, and/or Muratov's direction or with their knowledge—also transmitted fraudulent Rate Confirmations to Abaxes and members of the Class. VL then paid Abaxes and members of the Class the agreed-upon percentage of that fraudulently lowered amount. This allowed VL to skim the difference off the top while still receiving its percentage under the lease agreements.

94.     Defendants intended Abaxes and members of the Class to rely on these deceptive acts and practices so that Abaxes and members of the Class would never question their compensation under the lease agreements. In other words, by falsely representing that Abaxes and members of the Class were receiving a set percentage of the gross revenue a customer or broker paid to VL for a given job, Defendants knowingly and intentionally deprived Abaxes and members of the Class of the actual compensation they were entitled to under their respective lease agreements. Through their deceptive conduct, Defendants intentionally led Abaxes and members of the Class to believe that they were receiving their true and correct compensation under the lease agreements for that job.

95.     815 ILCS 505/2(f) defines "trade" and "commerce" as including the sale or distribution of any services. Defendants' deceptive acts occurred during the course of its trade or business, which included selling and distributing its various services under the lease agreements to Abaxes and members of the Class.

96.     Defendants' deception, *i.e.*, misrepresenting to Abaxes and members of the Class that the amount the customer or broker agreed to pay was lower than it actually was, was the proximate cause of the injuries to Abaxes and members of the Class. In other words, because of

Defendants' deception, Abaxes and members of the Class did not receive the full compensation they were entitled to under the lease agreements for jobs they did for VL during the Class Period.

97.     Defendants' deceptive conduct was willful and malicious.

98.     By virtue of these facts, Defendants violated 815 ILCS 505/2.

99.     Pursuant to 815 ILCS 505/10a(a), Abaxes and members of the Class are entitled to bring an action against the Defendants under the Illinois Consumer Fraud and Deceptive Business Practices Act.

100.     As a result of these violations, Abaxes and members of the Class are entitled to recover their actual damages. Actual damages for Abaxes will consist of 80% of the difference between the compensation amount that a broker paid to VL and the compensation amount that Defendants fraudulently misrepresented to Abaxes for each load that Abaxes hauled for VL during the Class Period. Damages for the members of the Class will be calculated similarly based on the agreed-upon compensation rates in their respective lease agreements with VL.

101.     As a result of these violations, Abaxes and members of the Class are also entitled to recover punitive damages in an amount sufficient to punish Defendants' conduct and deter others from committing similar torts.

102.     As a result of these violations, Abaxes and members of the Class are entitled to recover their attorneys' fees and costs pursuant to 815 ILCS 505/10a(c).

## COUNT IV

**Violation of the Illinois Deceptive Trade
Practices Act – 815 ILCS 510/2 (as to Defendant VL)
(Brought by Abaxes on Behalf of Itself and the Class)**

103.     Abaxes reasserts and incorporates by reference the allegations in paragraphs 1-58 and 84-102.

104. 815 ILCS 505/2 provides, in relevant part: "(a) A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person: … (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

105. During the Class Period, VL engaged in deceptive trade practices by falsely representing in lease agreements with Abaxes and members of the Class that VL would pay them an agreed-upon percentage, less valid expenses, of the gross revenue VL actually received from customers or brokers for a shipment. Pursuant to the lease agreements, VL would also retain a smaller percentage for various administrative expenses and charges.

106. In reality, VL never paid Abaxes and members of the Class based on the agreed-upon percentage of the gross amount VL actually received. Instead, VL falsely represented to Abaxes and members of the Class (via a text message or written electronic communication containing false rate information or via a forged Rate Confirmation) the total amount a broker paid to VL for a given job. VL then paid Abaxes and members of the Class based on a percentage of the fraudulently altered amount reflected in those texts/electronic communications and/or counterfeit Rate Confirmations.

107. Without notifying Abaxes and members of the Class, VL willfully engaged in an ongoing scheme to defraud Abaxes and members of the Class. During the Class Period, VL dispatchers—at Nedeltchev, Lynevych, and/or Muratov's direction or with their knowledge—consistently and intentionally sent text messages or other written electronic communications to Abaxes and members of the Class that falsely misrepresented amounts that customers or brokers actually paid to VL for a given job. This allowed VL to skim the difference off the top while still receiving its percentage under the lease agreements.

24

108.    Upon information and belief, the VL—at Nedeltchev, Lynevych, and/or Muratov's direction or with their knowledge—willfully sent Abaxes and members of the Class text messages containing knowingly false information about job rates and did so for the sole purpose of deceiving Abaxes and members of the Class into believing these false rates were the actual gross revenues VL received from the various customers or brokers. In reality, they were not.

109.    Without notifying Abaxes and members of the Class, VL willfully engaged in an additional ongoing scheme to defraud Abaxes and members of the Class. During the Class Period, VL dispatchers—at Nedeltchev, Lynevych, and/or Muratov's direction or with their knowledge—consistently and intentionally forged the brokers' Rate Confirmations to falsely represent the amount the customers or brokers paid VL for a given job. VL dispatchers—at Nedeltchev, Lynevych, and/or Muratov's direction or with their knowledge—also transmitted fraudulent Rate Confirmations to Abaxes and members of the Class. VL then paid Abaxes and members of the Class the agreed-upon percentage of that fraudulently lowered amount. This allowed VL to skim the difference off the top while still receiving its percentage under the lease agreements.

110.    Upon information and belief, the fraudulently altered Rate Confirmations contain the brokers' trade names and trademarked symbols. VL—at Nedeltchev, Lynevych, and/or Muratov's direction or with their knowledge—willfully forged these Rate Confirmations for the sole purpose of deceiving Abaxes and members of the Class into believing these were the original Rate Confirmations that VL received from the various customers or brokers. In reality, they were not.

111.    VL intended Abaxes and members of the Class to rely on these deceptive trade practices so that Abaxes and members of the Class would never question their compensation under the lease agreements. In other words, by falsely representing that Abaxes and members of the Class

were receiving a set percentage of gross revenue VL received for a given job, VL knowingly and intentionally deprived Abaxes and members of the Class of the true compensation they were entitled to under their respective leases. Through its deceptive conduct, VL intentionally led Abaxes and members of the Class to believe that they were receiving the true and correct compensation under the lease agreements for that job.

112. VL intentionally caused a "likelihood of confusion or misunderstanding" through these deceptive practices. Specifically, VL's fraudulent conduct in (1) sending texts messages containing knowingly false rate information, and (2) creating counterfeit Rate Confirmations and representing those Rate Confirmations as the real documents provided to VL by customers or brokers were intentional actions meant to confuse and mislead Abaxes and members of the Class about the true nature of the compensation they were entitled to under their lease agreements.

113. VL's deceptive acts occurred in the course of its trade or business, which was selling and distributing its various services under the lease agreements to Abaxes and members of the Class.

114. VL's deceptive trade practices were the proximate cause of the injuries to Abaxes and members of the Class.

115. On information and belief, the fraudulent conduct described above is ongoing, and pursuant to 815 ILCS 510/3, Abaxes and members of the Class are entitled to injunctive relief to stop VL from continuing its wrongful conduct and causing Abaxes and members of the Class further injury.

116. Pursuant to 815 ILCS 510/3, Abaxes and members of the Class are also entitled to recover their costs and attorneys' fees due to VL's willfully deceptive conduct as described above.

## COUNT V

**Breach of Contract by Defendant VL**
**(Brought by Abaxes on Behalf of Itself and the Class)**

117.     Abaxes reasserts and incorporates by reference the allegations in paragraphs 1-58 and 84-116.

118.     VL entered into valid and binding contracts with Abaxes and members of the Class under which VL was obligated to pay these owner-operators for transporting loads on VL's behalf. The lease agreements required VL to pay Abaxes and members of the Class based on an agreed-upon percentage, less any valid expenses, of the gross revenue VL received for each shipment. *See*, *e.g.*, **Exs. A** and **B.**

119.     VL breached these contracts through the course of conduct explained above.  VL's breach was willful and not the result of mistake or inadvertence.

120.     As a direct result of VL's unlawful conduct, Abaxes and members of the Class were injured because they did not receive the full compensation they were entitled to under the lease agreements for jobs they did for VL during the Class Period.

121.     As a result of the violations, Abaxes and members of the Class are entitled to recover their actual damages. Actual damages for Abaxes will consist of 80% of the difference between the compensation amount that a broker paid to VL and the compensation amount that VL fraudulently misrepresented to Abaxes for each load that Abaxes hauled for VL during the Class Period. Damages for the members of the Class will be calculated similarly based on the agreed-upon compensation rates in their respective lease agreements with VL.

## COUNT VI

### Common Law Fraud by Defendant VL
### (Brought by Abaxes on Behalf of Itself and the Class)

122.     Abaxes reasserts and incorporates by reference the allegations in paragraphs 1-58 and 84-121.

123.     During the Class Period, VL represented in its lease agreements with Abaxes and members of the Class that their compensation as owner-operators would consist of an agreed-upon percentage, less any valid expenses, of the gross revenues VL received for a shipment. *See*, *e.g.*, **Exs. A** and **B.**

124.     In reality, VL never paid Abaxes and members of the Class their agreed-upon share of the total gross amount VL received for a given job. Instead, during the Class Period, VL knowingly and intentionally defrauded Abaxes and members of the Class by:

   a. Knowingly and intentionally sending text messages or other written electronic communications about a job to Abaxes and members of the Class. In those communications, VL dispatchers would knowingly and intentionally provide false information about how much the customer or broker actually paid VL for that shipment. VL dispatchers would tell Abaxes and members of the Class that the gross revenue for the shipment was lower than what the customer or broker actually paid VL for the job. Additionally, VL refused to provide drivers with any sort of proof supporting the rate for the haul. VL then paid Abaxes and members of the Class based on the fraudulently lowered amount instead of paying them based on a percentage of the gross amount VL received as required by the lease agreements. This allowed VL to skim the difference off the top and still receive a percentage of that lowered amount.

28

b. Obtaining original Rate Confirmations from customers or brokers showing the actual gross revenue VL would receive for a given shipment, knowingly and intentionally forging those original Rate Confirmations to reflect a lower total price for the shipment, knowingly and intentionally forwarding these counterfeit Rate Confirmations to Abaxes and members of the Class, and representing to Abaxes and members of the Class that those fraudulent Rate Confirmations reflected the total amount a customer or broker actually paid VL for a given job. VL then paid Abaxes and members of the Class based on a percentage of the amount reflected in those fraudulently altered Rate Confirmations instead of paying them based on a percentage of the gross amount VL received as required by the lease agreements. This allowed VL to skim the difference off the top and still receive a percentage of the lowered amount.

125. VL's representations about the basis for compensating Abaxes and members of the Class under the lease agreements as described above were false and misleading.

126. VL's representations that the rate information contained in the text messages and other written or electronic communications regarding various job were false and misleading.

127. VL's representations that the forged Rate Confirmations were a true reflection of the total amount brokers paid VL for a given transportation job were also false and misleading.

128. Furthermore, VL knew that these representations to Abaxes and members of the Class were false and misleading.

129. VL intentionally made these representations to Abaxes and members of the Class to prevent them from questioning or negotiating their compensation under the lease agreements. In other words, by falsely representing that Abaxes and members of the Class were receiving a set

percentage of the gross revenues VL received for a given job, VL knowingly and intentionally deprived Abaxes and members of the Class of the true compensation they were entitled to under the lease agreements.

130.    Abaxes and members of the Class reasonably believed VL was paying them pursuant to the lease agreements. In fact, when Abaxes and members of the Class questioned certain rates or Rate Confirmations and confronted VL dispatchers, VL assured them that the rate information VL provided was the true amount VL received when it was not.

131.    As a direct result of VL's fraudulent actions, Abaxes and members of the Class were injured because they did not receive the full compensation they were entitled to under the lease agreements for jobs they did for VL during the Class Period.

132.    As a result of the violations, Abaxes and members of the Class are entitled to recover their actual damages. Actual damages for Abaxes will consist of 80% of the difference between the compensation amount that a broker paid to VL and the compensation amount that VL fraudulently misrepresented to Abaxes for each load that Abaxes hauled for VL during the Class Period. Damages for the members of the Class will be calculated similarly based on the agreed-upon compensation rates in their respective lease agreements with VL.

133.    As a result of these violations, Abaxes and members of the Class are also entitled to recover punitive damages in an amount sufficient to punish VL's wrongful conduct and deter others from committing similar torts.

### COUNT VII
**Aiding and Abetting Common Law Fraud by
Defendants Nedeltchev, Lynevych, and Muratov
(Brought by Abaxes on Behalf of Itself and the Class)**

134.    Abaxes reasserts and incorporates by reference the allegations in paragraphs 1-58 and 84-133.

30

135.    As described in Count VI, VL engaged in an ongoing scheme to defraud Abaxes and members of the Class for VL's personal financial gain. This scheme injured Abaxes and members of the Class in that they did not receive the full compensation they were entitled to under the lease agreements for jobs they did for VL during the Class Period.

136.    During the Class Period, Defendants Nedeltchev, Lynevych, and Muratov knowingly and substantially assisted in VL's fraudulent conduct in the following ways:

a.  On information and belief, Nedeltchev, Lynevych, and Muratov created the ongoing schemes VL employed to defraud Abaxes and members of the Class;

b.  On information and belief, once VL received Rate Confirmations or other rate information from customers or brokers for a given job, Nedeltchev, Lynevych, and Muratov knowingly directed or authorized VL employees to send text messages or other written electronic communications containing false information about shipment rates to Abaxes and members of the Class;

c.  On information and belief, once VL received Rate Confirmations from customers or brokers for a given job, Nedeltchev, Lynevych, and Muratov knowingly directed or authorized VL employees to fraudulently alter those Rate Confirmations to reflect that customers/brokers were paying VL a lower amount than what they were actually paying VL for a given job;

d.  On information and belief, Nedeltchev, Lynevych, and Muratov knowingly directed or authorized VL employees to send those counterfeit Rate Confirmations directly to Abaxes and members of the Class;

e.  On information and belief, Nedeltchev, Lynevych, and Muratov knowingly directed or instructed VL employees to not disclose any information about the true

shipment rates, the original Rate Confirmations, the forged Rate Confirmations, or any part of the overall schemes; and

f. On information and belief, Nedeltchev, Lynevych, and Muratov attempted to cover up the fraudulent scheme by informing its owner-operators that VL allegedly used the funds VL skimmed off the top to create an illegal slush fund for future chargebacks incurred by all the owner-operators working for VL. Nedeltchev, Lynevych, and Muratov refused to provide any detailed explanation as to how this fund worked or what chargebacks were being expensed to these owner-operators.

137. Each time Defendants Nedeltchev, Lynevych, and Muratov assisted with VL's overall fraudulent scheme as described in the preceding paragraph, they were regularly aware of their role as part of that scheme. Indeed, Defendants Nedeltchev, Lynevych, and Muratov knew that VL's actions were fraudulent, and they knowingly directed, instructed, and/or authorized VL employees to keep the details of the schemes secret from Abaxes and members of the Class because they knew VL's actions were wrong.

138. As a direct result of Nedeltchev, Lynevych, and Muratov's knowing and substantial assistance in VL's fraudulent scheme, Abaxes and members of the Class did not receive the full compensation they were entitled to under the lease agreements for jobs they did for VL during the Class Period.

139. As a result of Nedeltchev, Lynevych, and Muratov's knowing and substantial assistance in VL's fraudulent scheme, Abaxes and members of the Class are entitled to recover their actual damages. Actual damages for Abaxes will consist of 80% of the difference between the compensation amount that a broker paid to VL and the compensation amount that VL fraudulently misrepresented to Abaxes for each load that Abaxes hauled for VL during the Class

32

Period. Damages for the members of the Class will be calculated similarly based on the agreed-upon compensation rates in their respective lease agreements with VL.

140.    As a result of these violations, Abaxes and members of the Class are also entitled to recover punitive damages in an amount sufficient to punish Nedeltchev, Lynevych, and Muratov's wrongful conduct and deter others from committing similar torts.

## COUNT VIII

### Conspiracy to Commit Common Law Fraud by
### Defendants Nedeltchev, Lynevych, and Muratov
### (Brought by Abaxes on Behalf of Itself and the Class)

141.    Abaxes reasserts and incorporates by reference the allegations in paragraphs 1-58 and 84-140.

142.    As described in Count VI, VL engaged in an ongoing scheme to defraud Abaxes and members of the Class for VL's personal financial gain. This scheme injured Abaxes and members of the Class in that they did not receive the full compensation they were entitled to under the lease agreements for jobs they did for VL during the Class Period.

143.    During the Class Period, Defendants Nedeltchev, Lynevych, and Muratov conspired to further VL's wrongful fraudulent conduct in the following ways:

a.   On information and belief, Nedeltchev, Lynevych, and Muratov created the ongoing schemes VL employed to defraud Abaxes and members of the Class;

b.   On information and belief, once VL received Rate Confirmations or other rate information from customers or brokers for a given job, Nedeltchev, Lynevych, and Muratov knowingly directed or authorized VL employees to send text messages or other written electronic communications containing false information about shipment rates to Abaxes and members of the Class;

33

    c.   On information and belief, once VL received Rate Confirmations from customers or brokers for a given job, Nedeltchev, Lynevych, and Muratov knowingly directed or authorized VL employees to fraudulently alter those Rate Confirmations to reflect that customers/brokers were paying VL a lower amount than what they were actually paying VL for a given job;

    d.   On information and belief, Nedeltchev, Lynevych, and Muratov knowingly directed or authorized VL employees to send those counterfeit Rate Confirmations directly to Abaxes and members of the Class;

    e.   On information and belief, Nedeltchev, Lynevych, and Muratov knowingly directed or instructed VL employees to not disclose any information about the true shipment rates, the original Rate Confirmations, the forged Rate Confirmations, or any part of the overall schemes; and

    f.   On information and belief, Nedeltchev, Lynevych, and Muratov attempted to cover up the fraudulent scheme by informing its owner-operators that VL allegedly used the funds VL skimmed off the top to create an illegal slush fund for future chargebacks incurred by all the owner-operators working for VL. Nedeltchev, Lynevych, and Muratov refused to provide any detailed explanation as to how this fund worked or what chargebacks were being expensed to these owner-operators.

144.   The purpose of Nedeltchev, Lynevych, and Muratov's concerted actions was to further VL's ongoing scheme to defraud Abaxes and members of the Class out of compensation they were owed under their respective lease agreements.

145.   As a direct result of Nedeltchev, Lynevych, and Muratov's concerted efforts to further VL's fraudulent scheme, Abaxes and members of the Class did not receive the full

compensation they were entitled to under the lease agreements for jobs they did for VL during the Class Period.

146.    As a direct result of Nedeltchev, Lynevych, and Muratov's concerted efforts to further VL's fraudulent scheme, Abaxes and members of the Class are entitled to recover their actual damages. Actual damages for Abaxes will consist of 80% of the difference between the compensation amount that a broker paid to VL and the compensation amount that VL fraudulently misrepresented to Abaxes for each load that Abaxes hauled for VL during the Class Period. Damages for the members of the Class will be calculated similarly based on the agreed-upon compensation rates in their respective lease agreements with VL.

147.    As a result of these violations, Abaxes and members of the Class are also entitled to recover punitive damages in an amount sufficient to punish Nedeltchev, Lynevych, and Muratov's wrongful conduct and deter others from committing similar torts.

## PRAYER FOR RELIEF

WHEREFORE, Abaxes, on behalf of itself and the Class, pray for relief as follows:

A.    Certification of this action as a class action pursuant to Federal Rule of Civil Procedure 23 and appointment of Abaxes and its Counsel to represent the Class;

B.    Judgment against Defendants, jointly and severally, for an amount equal to the Class Representatives' and the Class's unpaid compensation due under their contracts with VL;

C.    Judgment against Defendants, jointly and severally, for punitive damages in an amount sufficient to punish Defendants for their wrongful acts and to deter others from committing similar torts;

D.    A declaration permanently enjoining VL's systemic practice of underpaying owner-operators based on altered Rate Confirmations that fraudulently lower the amount those owner-operators should receive under their respective lease agreements;

E.    Injunctive relief permanently enjoining VL's systemic practice of underpaying owner-operators based on altered Rate Confirmations that fraudulently lower the

amount those owner-operators should receive under their respective lease agreements;

F.      Attorneys' fees and costs incurred prosecuting this claim;

G.      An award of prejudgment interest; and

H.      All other relief that is proper under the contract and applicable statutes, and such further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Abaxes, on behalf of itself and the Class, requests a trial by jury on all issues that may be tried by jury.

Dated:    April 22, 2022                                      Respectfully submitted,

ABAXES, INC., individually and on behalf of a class of others similarly situated

By:   _/s/ Daniel L. Stanner_
One of Their Attorneys

Caesar A. Tabet (ARDC #6196308)
Daniel L. Stanner (ARDC #6210770)
Nicole R. Marcotte (ARDC #6338479)
TABET DIVITO & ROTHSTEIN LLC
209 South LaSalle Street, 7th Floor
Chicago, Illinois 60604
Telephone:     (312) 762-9450
Facsimile:      (312) 762-9451
ctabet@tdrlawfirm.com
dstanner@tdrlawfirm.com
nmarcotte@tdrlawfirm.com

Steve McCann (ARDC #6318252)
BALL & MCCANN, P.C.
161 North Clark Street, Suite 1600
Chicago, Illinois 60601
Telephone:     (872) 205-6556
Facsimile:      (872) 204-0244
Steve@BallMcCannLaw.com